**HOOVER, INC., Appellant,**

v.

**McCULLOUGH INDUSTRIES, INC.,**
**Appellee.**

**No. 23204.**

United States Court of Appeals
Fifth Circuit.

July 13, 1967.

Judson Harwood, Nashville, Tenn., Sam W. Pipes, III, Mobile, Ala., for appellant.

J. Edward Thornton, Mobile, Ala., Robert McD. Smith, Birmingham, Ala., for appellee, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., of counsel.

Before BROWN, MOORE * and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge:

This is an appeal from a judgment entered in a breach of contract suit. McCullough filed suit against Hoover, alleging a breach of contract and seeking damages therefor. Hoover filed an answer and cross-complaint, claiming that McCullough breached the contract and that Hoover was entitled to damages. Utilizing a split trial procedure, the District Court submitted the breach of contract question to a jury and reserved the question of damages for a Special Master. The jury, on special interrogatories, found that Hoover breached the contract and judgment was entered for McCullough. Damages and costs were then assessed against Hoover by the Special Master and the report of the Master was made the judgment of the court. Hoover appeals from both judgments. We affirm except as to one item of damages.

The Alabama Highway Department awarded a contract to Wright Contracting Company for construction of a section of Interstate Highway 65 in Cone-

* Of the Second Circuit, sitting by designation.

cuh County, Alabama. Wright ordered the road aggregates, including base stone, needed to perform the contract from McCullough and the purchase order required that the aggregates meet the Alabama Highway Department specifications. McCullough, in turn, contracted with Hoover to quarry and supply the base stone.

The contract between McCullough and Hoover was negotiated without benefit of counsel and, in pertinent part, provided as follows:

"Hoover agrees to assume the following responsibilities:

"1. To quarry and crush approximately 131,000 yds. of base stone meeting Alabama Highway Specification #3 and/or #5, each size to constitute approximately one-half (½) the total. Hoover shall only be responsible for the stone meeting the above specifications in respect to gradation only.

\* \* \* \* \* \*

"3. To load into McCullough trucks or to stockpile all stone crushed which meets the above specifications and to weigh all stone so loaded or stockpiled.

"4. To remove by-products from the crushed stone, as is necessary in order that the remaining stone shall meet state specifications, to a place agreeable to McCullough and Hoover. All by-products or waste materials are to be the property of McCullough."

McCullough provided the quarry, stockpile site, and obtained the State Highway Department's approval of the quarry. It turned out that the bid had been awarded to Wright on the idea that no quarry was available in the area and that the base stone would be purchased in the normal channels of supply. The quarry was marginal at best in the sense of the quality of the rock and it developed that an extra step in production—washing—was necessary. The rock, however, had been tested at the instance of McCullough prior to taking the contract from Wright and prior to contracting with Hoover. The samples met the specifications. Hoover visited the quarry prior to enter-

ing into the contract with McCullough and was experienced in the operation of quarries.

The essence of the dispute between the parties is to be found in paragraphs 1 and 4 of the agreement, supra. Section 801.03 of the specifications provided that "Crushed stone shall consist of clean, tough, durable fragments of rock conforming with the class and gradation specified." These specifications set out certain tests for determining durability. It was Hoover's position that it was responsible for gradation (size) only. Mr. Hoover had this in mind when the contract, which was prepared by him, was negotiated with Mr. McCullough at the Birmingham Airport. On the other hand, Hoover admits in its brief (p. 13), that under paragraph 4 of the contract it was " \* \* \* obligated to remove the by-products as was necessary to make the remaining stone meet the State specifications with respect to gradation only."

The stone produced by Hoover was not acceptable to the Highway Department for the reason that it contained clay and mud fragments. Section 801.02 of the Highway Department's specifications allowed for certain deleterious substances in crushed stone, including clay lumps, but not to exceed, in the case of clay lumps, a limit of 0.25 per cent. The stone in question failed to meet this standard. McCullough refused to pay Hoover for the stone produced because it did not pass inspection and the dispute as to the meaning of the contract then arose.

After a conference concerning the matter, Hoover agreed to install a washing process which included the use of a log washer but the agreement was without prejudice to its rights under the original contract. McCullough agreed to, and in fact installed a similar washing process on its own for reprocessing the stockpile of stone on hand. This solved the problem with respect to the specifications. The operation went forward for about a month but Hoover then abandoned the contract. A fair inference from the record is that the contract was already un-

profitable or that the washing process made it so. In addition, McCullough had made only nominal payments to Hoover.

After a long trial the breach of contract issue was submitted to the jury on the following special interrogatories:

"(1) Under the contract, was Hoover to produce aggregate, which met all state specifications, namely, as to hardness, durability, gradation and cleanness;

"(2) Under the contract was Hoover to produce aggregate, which met state specifications only as to gradation."

The jury answered the first interrogatory in the affirmative and the second in the negative. At the close of the evidence McCullough moved for a directed verdict, and also objected to the court submitting the question of the meaning of the contract to the jury, taking the position that the question was one of law to be resolved by the court. McCullough also objected to the form of the interrogatories. Hoover offered no objection to the charge or to the form of the interrogatories nor did it make a motion for a directed verdict.

Hoover, nevertheless, now contends that the District Court erred in denying its motion for new trial on the ground that the evidence was insufficent to warrant the verdict. It also contends that the court erred in submitting the meaning of the contract to the jury. This is on the reasoning that the contract was not ambiguous. Ancillary to this contention Hoover urges that the court erred in permitting the introduction of oral evidence to contradict the clear terms of the contract.

■ It is McCullough's position that Hoover has no standing to assert these errors in view of its failure to move for a directed verdict and to object. We have held that a litigant is bound by a jury verdict based on conflicting evidence where no motion for directed verdict was made. Thomas v. Akin Equipment, Inc., 5 Cir., 1962, 309 F.2d 331; Stokes v. Continental Assurance Co., 5 Cir., 1957, 242 F.2d 893; and

Baten v. Kirby Lumber Corp., 5 Cir., 1939, 103 F.2d 272. We have also held that an appellant is bound by instructions given, absent plain error, where no objection was made. See Pruett v. Marshall, 5 Cir., 1960, 283 F.2d 436; and Western Fire Insurance Company, etc. v. Word, 5 Cir., 1942, 131 F.2d 541. See also Rule 51, F.R.Civ.P. Hoover relies for standing on Stewart v. Gilmore, 5 Cir., 1963, 323 F.2d 389, where we said that a Court of Appeals has the power and duty to set aside a jury verdict where the ends of justice require it. This statement rested on a clear holding that the verdict was without evidentiary basis. It does not appear that a motion for directed verdict was made in the case. The statement is in line with a previous ruling of this court that a denial of a new trial is subject to appellate review where there is an absolute absence of evidence to support the verdict even when no motion for directed verdict was made. Indamer Corporation v. Crandon, 5 Cir., 1954, 217 F.2d 391.

■ These decisions indicate that we should review the record to ascertain whether there was an absence of evidence to support the verdict. They also indicate that we should determine whether the court committed plain error in submitting the meaning of the contract to the jury. Cf. Nichols v. Hartford Accident & Indemnity Company, 5 Cir., 1962, 310 F.2d 704; Ford v. United Gas Corporation, 5 Cir., 1951, 254 F.2d 817; and Maryland Casualty Co. v. Reid, 5 Cir., 1935, 76 F.2d 30.

■ In our review of this diversity case we take the applicable contract law from Alabama. The Alabama decisions hold that it is for the court, in the first instance, to ascertain whether a contract is ambiguous in light of its terms. The court must determine the meaning of the contract where there is no ambiguity. In such case no jury question is presented. The court must also determine, in the first instance, whether the contract is void. If the court concludes that the contract is ambiguous but not void, then its meaning is for the jury. The jury

may then ascertain its meaning by a consideration of the facts and circumstances surrounding its making. It is the province of the jury to settle the facts and to draw inferences from the facts upon proper instructions from the court. See Air Conditioning Engineers, Inc. v. Small, 1953, 259 Ala. 171, 65 So.2d 698; and Foster and Creighton Company v. Box, 1953, 259 Ala. 474, 66 So.2d 746.

Hoover's position on the contract law is that the language of paragraph 1 of the contract, being prior in the contract, controlled over the language of paragraph 4. In Epperson v. Stacy, 1957, 266 Ala. 396, 96 So.2d 750, the court pointed to the rule that where there is an inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause unless an intention to thereafter qualify it is plainly expressed. In our view, as will be seen, the facts do not make out such a case. Paragraphs 1 and 4 were not necessarily inconsistent. Moreover it is not clear that paragraph 1 was not qualified by the language of paragraph 4.

■ The court correctly submitted the meaning of the contract to the jury. The contract was ambiguous but not void. Hoover agreed to furnish the base stone under paragraph 1 and limited its responsibility under the specifications to gradation only. Hoover then assumed the obligation under paragraph 4 to remove such by-products from the crushed stone as was necessary in order that the remaining stone would meet specifications. The term "by-products" may or may not have included clay and mud fragments. This was one ambiguity. Another ambiguity arises when paragraph 1 is considered alone. What was the extent of the obligation of Hoover with respect to furnishing the base stone to McCullough? Hoover agreed to quarry and crush the stone. Did this obligation include separating clay and mud fragments from the stone prior to delivery or was it to be handed over to McCullough as a mixture of stone, clay and mud? These were questions for the jury.

This brings us to the denial of Hoover's motion for a new trial. Some confusion was created in the trial by the breadth of the first interrogatory. The evidence did not create a direct issue as to the hardness or durability of the stone. The dispute was over gradation and cleanness. Hoover proceeded at the trial on the theory that it was responsible for gradation only. McCullough's position was that Hoover was responsible for gradation and also cleanness to the extent that clay and mud fragments were removed from the stone. The sizing necessary to comply with the gradation specifications was accomplished by sifting crushed stone through screens. Stone in a desired size from a mass placed on the screen would be sifted through a top screen. Stone in larger sizes would not pass through the screen. The desired size and smaller sizes would fall down to a second screen. The smaller sizes would then fall through the second screen and the desired size would be removed from the top of the second screen. The trouble was that clay and mud fragments in the same size were left with the stone.

■ The evidence was undisputed that the stone met all specifications once the clay and mud was separated from the stone by the washing process. The real question which the jury had to determine was simple: Whose responsibility was it to remove the clay and mud fragments from the stone? This depended on whether Hoover, as part of its obligation under paragraph 1 to furnish the stone, was required to furnish stone free of clay and mud fragments. It also depended on whether the obligation in paragraph 4 to remove "by-products" embraced clay and mud fragments. The jury, apparently recognizing that the first interrogatory included matters not directly in issue, sought the permission of the court to revise the interrogatories but permission was refused. The form of the interrogatory was favorable to Hoover. It definitely had no obligation for hardness and durability per se. Thus

its failure to object is understandable. In any event, the jury then answered the interrogatories as stated. We hold that the verdict is supported by the evidence in spite of the inclusion of the elements of hardness and durability in the first interrogatory. Our reasoning is that the specification as to hardness and durability could not have been met unless the clay and mud fragments were removed. This is plain from the description of the wear test which was required under § 801.03(b) of the specifications. Also, the interrogatories, taken together and with the evidence, afford a fair basis for the judgment against Hoover in light of its defense of being responsible for gradation only.

This leaves for consideration the question of the damages awarded by the Special Master. The Master's report consists of a conclusion that damages in the amount of $19,176.60 was due McCullough by Hoover. The report states: " * * * This determination was arrived at as set out on the attached exhibits with each item of adjustment explained in the notes annexed thereto."

The Master's report reflects the following items. Hoover owed McCullough an undisputed sum on account and the Master correctly charged this to Hoover. Hoover contracted to furnish 162,244[1] tons of base stone at $1.73 per ton. The Master credited Hoover with the price of 16,512 tons of stone which had been produced and which was accepted. McCullough purchased 65,902 tons of slag in an effort to complete the contract. The Master charged Hoover with the difference between the cost of the slag and the contract price and Hoover does not object to this charge.

■ It was necessary to obtain 80,240 additional tons of stone to complete the contract and this was furnished by McCullough out of the same quarry. McCullough commenced to operate the quarry after it had been abandoned by Hoover and produced a total of 175,785 tons. The tonnage produced over and above that needed to complete the contract was sold to another contractor. Hoover contends that the cost incurred by McCullough in this operation was excessive and that it was overcharged by the Master for this tonnage. McCullough's evidence reflected a cost per ton as high as $3.50. The Master allowed a cost of $2.34. This figure appears to be well in line with prices prevailing generally in the area when transportation costs are added to the base price. The Master's award of the difference between this cost per ton and the contract price on the 80,240 tons was not erroneous.

■ This leaves one item of damages. The 175,785 tons produced by McCullough included 44,320 tons which was produced by reprocessing stone which had been quarried and stockpiled by Hoover. The Master was of the view that Hoover was entitled to some extra credit for this activity. He arrived at a figure of $23,886.25 as a credit. This award was based on the conclusion that McCullough's cost of production on this tonnage was reduced by at least $1.00 per ton. The Master subtracted the tonnage necessary to complete the contract, 80,240 tons, from the total of 175,785 tons produced, and awarded Hoover 25 cents per ton on the balance produced, 95,545 tons, or a total of $23,886.25. This may have been a fair approach to the question. The award may be adequate or even generous but we are unable to find any evidence whatever in the record to support the $1.00 per ton figure as the amount of reduction in McCullough's cost of production. It is necessary, therefore, that the matter be reversed and remanded on this one item of damages. Hoover's objection on this score was sufficient. Each party will be entitled to submit evidence on remand on the question. The District Court may, in its discretion, hear the matter or refer it to the Master for hearing.

Affirmed in part; reversed in part; and remanded for further proceedings not inconsistent herewith.

1. The Master converted yards as used in the contract to tons.