**W. Stanley JONES and Thomas E. Walker, partners d/b/a Stanley Jones Company, Appellants,**

v.

**CHANEY & JAMES CONSTRUCTION COMPANY, Inc., Appellee.**

No. 24940.

United States Court of Appeals
Fifth Circuit.

Aug. 12, 1968.

Morris K. Sirote, Birmingham, Ala., for appellants.

Allen Poppleton, James L. North, Birmingham, Ala., for appellee.

Before THORNBERRY, AINSWORTH and DYER, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellee entered into a contract ("the prime contract") with the United States of America, acting through the Corps of Engineers, for the construction of a rocket test facility at the Marshall Space Flight Center, Huntsville, Alabama. Shortly thereafter, appellee entered into a subcontract with appellants on a unit price basis ($1.00 per cubic yard for excavation; $1.25 per cubic yard for "borrow") for a portion of appellee's work under the prime contract, specifically, the excavation and backfill required. After performing the subcontract, appellant instituted this diversity suit[1] claiming certain sums of money allegedly due from appellee, which are computed as follows:

(a) Contract Retainage. A claim for approximately $2500.00 allegedly due as final retainage on the contract. This claim was not contested, appellee having admitted indebtedness for this amount at the pre-trial hearing.

(b) Rehandling of Stockpiled Materials. A claim for approximately $9200.00 for rehandling material which had been previously excavated and stockpiled by appellants.

(c) Special Tamping. A claim for approximately $3300.00 allegedly due for spreading and tamping by hand, rather than mechanically as appellants had anticipated, certain earth or "backfill" which was used to refill a previously excavated area.

---

1. Federal jurisdiction was not based on the Miller Act due to late filing.

The trial court found as a matter of law that the terms of the contract were clear and unambiguous and that both of appellants' contested claims were foreclosed by specific contract provisions. Accordingly, at the close of appellants' case, the court granted appellee's motion for a directed verdict and directed the jury to find for the appellee on the contested claims and for appellants on the uncontested claim for contract retainage. On this appeal, appellants contend that the trial court erred in granting appellee's motion for a directed verdict on the contested claims.

## I. JURISDICTION

At the outset, we consider appellee's contention that this Court is without jurisdiction because appellants failed to file a proper notice of appeal from the judgment of the trial court. The jury's verdict was returned on March 7, 1967. Judgment on the verdict was entered on March 8, 1967. Appellants gave notice of appeal on March 20, 1967 from the "six separate and several rulings entered in this action on March 7", all of which were rendered prior to the entry of the final judgment on March 8 and were unappealable. Appellee maintains that appellants have therefore failed to file a notice of appeal from the only judgment entered in this cause and that inasmuch as appeals may be taken only from final decisions, 28 U.S.C. § 1291, this Court is without jurisdiction.

 The notice of appeal, however, should not be used as a "trap for the unwary draftsman", Wright, Federal Courts § 104 at 406 (1963); and decision on the merits should not be avoided on the basis of "mere technicalities", Foman v. Davis, 1962, 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225. This Court has consistently said that an appeal will be entertained where an "overriding intent to appeal" may be reasonably inferred from the text of the notice and the defect has not materially misled the appellee. Markham v. Holt, 5th Cir. 1966, 369 F.2d 940, 943. Appellee contends, however, that these principles cannot be invoked in appellants' favor because they intentionally avoided appealing from the March 8 judgment in order to avoid jeopardizing the judgment below in their favor. Hence, appellants' "overriding intent", it is argued, was clearly to avoid appealing from the judgment of the trial court.

 We disagree. Appellee bases its position on the contention that an appeal on the contested claims would supersede the entire judgment, making the claim in appellants' favor uncollectible. But an appeal would only supersede the challenged portion of the judgment in this case where there are several independent claims for which relief is sought. Appellants' notice of appeal expressly sought review of only those rulings adverse to their position on the contested claims, and thus that portion of the judgment favoring them on the uncontested claim would not be jeopardized by appeal. There is no reason to believe that the defect in the notice was anything other than a mistake by counsel or that appellants deliberately sought to circumvent the judgment of March 8 and predicate their appeal on the clearly interlocutory, unappealable trial rulings of March 7. Quite the contrary, appellants' intention to seek review of the only judgment in the cause seems clear. There is no indication that the defect has materially misled appellee. Accordingly, we proceed to the merits of this controversy.

## II. APPELLANTS' CLAIM BASED ON THE REHANDLING OF STOCK PILED MATERIALS

Under the subcontract appellants were to excavate a 600-foot tunnel leading to the test stand facility. It was originally contemplated that, prior to the excavation of the tunnel, work on the test stand facility would be brought to the point that the appellant subcontractors could place material excavated from the tunnel in the main structural cavity at the test stand. However, before work on the test stand had progressed sufficiently to absorb the excavated material,

appellee instructed appellants to proceed with the excavation of the tunnel area and to stockpile the excavated material adjacent to the tunnel, where it remained for about 120 days. Thereafter, appellants, pursuant to instructions from appellee, moved the stockpiled material and deposited it at various locations on the site. A small portion of this material was later moved back and used to backfill the tunnel. Appellants billed appellee for the rehandling of the stockpiled material as "borrow" under the subcontract; and appellee, in turn, presented a claim as "borrow" to the Corps of Engineers under the prime contract. When the Government's Contracting Officer disallowed appellee's claim under the prime contract, appellee refused to pay the claim for additional work under the subcontract and the appellant subcontractors filed this suit.

Appellants base their claim on the contention that rehandling the material previously excavated and stockpiled by them constitutes "borrow" under the subcontract. At the trial they introduced evidence of the construction of the subcontract by the parties as well as evidence of a well-established trade custom or usage indicating that "excavation", as understood by those engaged in the excavation industry in Alabama, is a continuous process which is completed once the material is excavated and stockpiled and that the rehandling of the stockpiled material constitutes another unit of work for which the contractor is entitled to additional payment. Appellee, on the other hand, maintains that the contract provisions contemplated both that "excavation", for which appellants were admittedly paid, included rehandling and that material excavated as a part of contract performance could not be considered or paid for as "borrow". Appellee objected to the introduction of extrinsic evidence by appellants on the ground that the contract itself carefully set out complete and unambiguous definitions of the disputed terms. The court reserved ruling after noting that appellee's objec-

tion would stand as to the entire line of such testimony.

At the close of appellants' case, the court, agreeing with appellee, ruled that the terms of the contract were clear and unambiguous and that the "rehandling of the previously excavated and stockpiled material and bringing it back to backfill the tunnel area could not under any circumstances be considered borrow * * * and it would be immaterial under these circumstances as to the general custom and usage where the definitions are plainly spelled out as they are in this contract." (R.116). The record reveals that the court's directed verdict was based entirely on its interpretation of the contract between the parties, and that, despite the fact that appellants have given great emphasis to these points in their brief, the disputes clause of the prime contract, the Contracting Officer's adverse decision, and the proceedings in connection therewith played no part in the court's decision. Accordingly, this Court must determine whether the trial court's interpretation was correct.

Once the court determined that the contract was not ambiguous, the conclusion that extrinsic evidence could not be permitted to vary or contradict its terms followed as a matter of the applicable Alabama substantive law. With respect to usage, in Homeland Insurance Co. v. Crescent Realty Co., 1964, 277 Ala. 213, 168 So.2d 243, 246, the rule was stated as follows:

> Usage may be admissible to explain what is doubtful but is never admissible to contradict what is plain, or to change an express contract.

As to custom, in Ison Finance Co. v. Glasgow, 1957, 266 Ala. 391, 96 So.2d 737, 740, the court said:

> * * * a custom cannot be operative if it is opposed to the express language of the contract. It may serve to clarify an ambiguity in a contract but cannot vary it.

It is clear that the court acted properly in determining whether or not the con-

tract was unambiguous, for that is a function of the court, not the jury. In Hoover Inc. v. McCullough Industries, Inc., 5th Cir. 1967, 380 F.2d 798, 801, this Court stated:

> The Alabama decisions hold that it is for the court, in the first instance, to ascertain whether a contract is ambiguous in light of its terms. The court must determine the meaning of the contract where there is no ambiguity. In such case no jury question is presented.

On the other hand,

> If the court concludes that the contract is ambiguous but not void, then its meaning is for the jury. The jury may then ascertain its meaning by a consideration of the facts and circumstances surrounding its making.

Hoover, Inc. v. McCullough Industries, Inc., supra.

Thus the issue becomes one of whether the trial court was correct in holding that the contract definitions and terms were clear, complete and unambiguous. We do not reach appellants' contention based on the "trade meaning" rule enunciated by the Court of Claims in Gholson, Byars and Holmes Construction Co. v. United States, 1965, 351 F.2d 987, 173 Ct.Cl. 374, allowing testimony, in some cases, even where a contract term is on its face unambiguous, for we hold that the disputed terms of the contract were, as a matter of law, ambiguous and therefore that the trial court erred in directing a verdict for appellee.

The question is the meaning of the terms "excavation" and "borrow", defined by Sections 51–03(a) and 51–03(b) as follows:

> (a) Excavation. Excavation consists of excavating and grading for site improvement, tunnel, roadways, and paved areas, including ditches, excavating of all unsuitable materials from the subgrade, excavating material which sloughed or washed into the test stand excavation, and disposing of all excavated materials, as specified, and in conformity with the lines, grades, cross sections, and dimensions shown. Excavation shall include any excavation or grading along the roadway and within the paved areas, other than excavation from borrow areas, required to produce in-place complete the materials necessary for embankments and fills and to replace unsatisfactory materials from other excavation or grading operations. All excavation shall be performed on an unclassified basis.

> (b) Borrow. Borrow consists of approved material from either existing stockpiles, borrow areas on the reservation as designated by the Contracting Officer, or private borrow pits selected by the Contractor as provided in the paragraph entitled 'Selection of Borrow Material', when sufficient quantities of suitable material are not available from other excavations. All excavated borrow material shall be disposed of as specified and in conformity with the lines, grades, and dimensions directed. When satisfactory material is not obtainable from other excavations for topping embankments, cushioning rock embankments, reinforcing unsatisfactory subgrade soil, and for backfilling cuts where excavation below grade is authorized, the material for these purposes shall be obtained under this item, as directed. Widening of roadway cuts and ditches will be considered excavation and not borrow. All borrow excavation shall be performed on an unclassified basis.

"Excavation" includes excavation "*and disposing of* all excavated material" and "any excavation required to produce *in place* complete the materials necessary for embankments and fills * * *" But was excavation intended to be a continuous process that ends once the material is excavated and stockpiled, thereby entitling appellants to additional compensation for rehandling, or does appellants' obligation to "dispose" and to produce materials "in place" encompass all forms of subsequent rehandling of excavated material, whether previously

stockpiled or not? The term defining the extent of appellants' obligation to "excavate" is thus ambiguous.

Appellee nevertheless maintains that appellants' claim is in any event foreclosed by the clear and unambiguous definition of "borrow" contained in Section 51–03(b). However, we also find ambiguities in the definition of "borrow". Borrow may consist of approved material from "existing stockpiles". An ambiguity arises in that "existing stockpiles" may contemplate only stockpiles in existence when appellants commenced work under the subcontract, or, on the other hand, this term may encompass the material excavated by appellants and stockpiled on appellee's instructions for 120 days. This is one ambiguity. Material can be considered and paid for as borrow only "when sufficient quantities of suitable material are not available from other sources". This provision could be construed to mean that no material could be paid for as borrow until all previously excavated material, including that taken from the tunnel by appellants, was completely used up as backfill. On the other hand, this clause may mean "not available" with respect to the demands of a particular item of work. Thus the requirement would be met in these circumstances where the material stockpiled adjacent to the tunnel was moved in order to make room for other work: material from other sources would not be "available" for the purpose of moving this material to another location. Moreover, there is nothing in the definition of either "excavation" or "borrow" that indicates whether material excavated as a part of contract performance could be considered and paid for as "borrow".

■ One thing is clear: the terms of the contract are unclear. More than one reasonable construction of the disputed terms is possible. It is therefore for the jury to ascertain their meaning by a consideration of all relevant evidence bearing on the parties' probable intention, including custom and trade usage.

■ Two further matters require only brief consideration. Appellee maintains that even if the contract is ambiguous, appellants' evidence of custom and usage as to "one continuous movement" of materials is inadmissible because it was limited to evidence pertaining to the highway construction industry. We reject this contention. There was testimony indicating that the custom and usage relied upon exists in the excavation industry generally and is not limited to the highway construction industry. Moreover, evidence of the custom regarding excavation in the highway construction industry would not appear to be so unrelated to excavation surrounding the construction of a rocket test stand as to be wholly without probative value. This case is clearly distinguishable from Gelco Builders & Burjay Construction Corp. v. United States, 1966, 369 F.2d 992, 993, 177 Ct.Cl. 1025, where the court found that the trade practice concerning duct insulation in the commercial building industry was "just the reverse" of that in the Federal Post Office construction industry. The evidence of custom and usage is admissible and may be weighed by the jury along with the other evidence.

Finally, we hold only that appellants' claim that the rehandlling of the stockpiled material constituted "borrow" under the contract presented questions of fact for the jury. We do not reach appellants' contention that they are also entitled to proceed on the alternative theories that the extra work constituted further "excavation" or on quantum meruit. This is a matter for the trial judge to determine on a new trial in light of the pre-trial order of January 3, 1967.

## III. APPELLANTS' CLAIM BASED ON SPECIAL TAMPING

Appellants also seek to recover compensation for special hand tamping of backfill which was used to refill the tunnel. It appears that backfill and compaction are ordinarily accomplished by the use of a front-end loader, which

spreads the dirt, and a sheepfoot roller drawn by the same machine which compacts the dirt. This equipment spreads and compacts the dirt at a relatively fast pace. Backfill around the tunnel, however, could not be accomplished mechanically due to restricted space and rods emanating from the tunnel every 40 feet. Accordingly, spreading and tamping between the rods had to be done by hand rather than mechanically as appellants had anticipated. This method is more expensive than backfilling and compacting with regular equipment, and appellants billed appellee an additional sixty cents per cubic yard for this item of work, which was the price included in their bid for hand tamping.

The trial court held that appellants' special tamping claim was foreclosed by a provision in the contract prohibiting the use of heavy equipment that would overload structures adjacent to the area being backfilled. Section 51–15(a) of the parties' contract provides:

(a) *Backfill Adjacent to Structures.* Backfill adjacent to structures shall be placed and compacted symmetrically and uniformly in such manner as to prevent wedging action or eccentric loading upon or against structures. Slopes bounding or within the areas to be backfilled shall be stepped or serrated. During backfilling operations and in the formation of embankments as specified in the paragraph entitled 'Formation of Embankments', *equipment that will overload the structure in passing over and compacting these fills shall not be used.* (Emphasis added.)

It is argued that Section 51–15(a) alerted appellants to the fact that, in some areas, heavy equipment could not be used, requiring that in those areas their contractual duty to backfill would have to be accomplished by whatever other method was required by the physical confines of the area being backfilled and compacted.

 We again conclude, however, that there is no clear, unequivocal language in the contract to support the trial court's holding. In the first place, it is possible that Section 51–15(a) is inapplicable in this situation. Special tamping was required due to the restricted space at the base of the tunnel and the rods emanating from the tunnel, not because equipment would "overload the structure in passing over and compacting these fills * * *" Moreover, the reference to "equipment" could imply that appellants are obligated to backfill and compact only where this can be accomplished with mechanical equipment. The terms of the contract are therefore ambiguous, presenting an issue of fact as to their meaning to be decided by the jury.

Accordingly, we reverse and remand for a new trial on the disputed claims based on the rehandling of stockpiled material and special tamping.