**Alfredo G. PARRISH et al., etc., Plaintiffs-Appellants,**

v.

**BOARD OF COMMISSIONERS OF the ALABAMA STATE BAR et al., etc., Defendants-Appellees.**

**ALABAMA BLACK LAWYERS ASSOCIATION et al., Plaintiffs-Appellants,**

v.

**BOARD OF COMMISSIONERS OF the ALABAMA STATE BAR, etc., et al., Defendants-Appellees.**

**Nos. 73–3553, 74–1523.**

United States Court of Appeals, Fifth Circuit.

Dec. 2, 1974.

Opinion Withdrawn Feb. 20, 1975. See 509 F.2d 540.

---

**14**

U. W. Clemon, Oscar W. Adams, Jr., Birmingham, Ala., Elaine R. Jones, Jack Greenberg, New York City, Solomon Seay, Jr., Montgomery, Ala., for plaintiffs-appellants.

Truman Hobbs, Champ Lyons, Jr., William H. Morrow, Jr., Montgomery, Ala., for defendants-appellees.

Before TUTTLE, WISDOM and GEE, Circuit Judges.

TUTTLE, Circuit Judge:

The Alabama Black Lawyers Association (ABLA) and eight named plaintiffs appeal the grant of summary judgment against them on all issues in their class action alleging racial discrimination by the Boards of Commissioners and Bar Examiners of the Alabama Bar Association in their policies and practices governing admission to the bar.

Briefly stated, the suit sought injunctive and declaratory relief, under 42 U. S.C. §§ 1981–1983 and 28 U.S.C. §§ 2201–2202, respectively, for a class defined as "all Black persons who have applied or will apply for admission to the Alabama Bar, or who would have so applied but for having been discouraged or prevented from doing so by the [defendants'] discriminatory practices" and who meet all valid non-discriminatory standards for admission. The gist of the complaint, which was filed October 31, 1972, is that the Alabama bar examiners unconstitutionally discriminated against black applicants by identifying their supposedly anonymous examination papers and then grading them lower than white applicants who displayed equal proficiency. The complaint also alleged that the bar examination—which then [1] was exclusively written essay, "timed

and closed-book"—is "unvalidated" and not sufficiently "job-related", and thus unconstitutional because it fails blacks in disproportionately high numbers compared to whites.

Shortly after the complaint was filed, each party filed several motions. Most importantly, the defendants moved to dismiss plaintiffs Eddie Jones, Thomas W. Gray and the ABLA for lack of standing, and the plaintiffs moved that the trial judge recuse himself pursuant to 28 U.S.C. § 144. The trial judge granted defendants' motion to dismiss Jones, Gray and the ABLA, but refused —after a hearing had been held and affidavits filed—to recuse himself.

Both parties undertook extensive discovery. Plaintiffs received nearly 150 pages of answers to interrogatories from defendants and took two lengthy depositions from members of the Board of Bar Examiners. Defendants received answers to interrogatories from each of the named plaintiffs. None of the discovery revealed specific instances where the anonymity of the examinees had been compromised; at most, the plaintiffs swore that there were one or two instances when an examiner *could have seen* an examinee's test number. The plaintiffs' case thus boiled down to a proof of statistics. Statistics produced during the litigation showed, for example, that in the last ten bar examinations the passing rate for blacks had been 32% while it had been 70% for whites. Furthermore, in a state whose population is 25% black, the number of black lawyers is less than 1%.

Defendants moved for summary judgment on April 2, 1973, but the trial court withheld a ruling for over four months in order to give plaintiffs "ample opportunity to obtain by discovery facts to be used in traversing the motion". Plaintiffs accomplished all of their desired discovery during this period, with one exception: defendants failed to produce copies of all answer

---

1. Since July 25, 1973, Alabama has used the Multistate Bar Examination (MBE) as part of its own bar examination. The MBE is an "objective," multiple-choice type of test.

sheets for the February 1973 bar examination. Defendants objected to producing these documents on the grounds that they were not relevant and material to the complaint. Plaintiffs filed a motion on May 28, 1973, to compel production.

Without specifically ruling on this motion, the trial court entered summary judgment for defendants on all issues on August 21, 1973. The court found that there was no material issue of fact between the parties and held that "under the circumstances . . . the disparity in percentage of failures among blacks as compared to whites has little weight and fails to make out a prima facie case sufficient to realign the burden of proof so as to require the Defendants to establish that the exams are not discriminatory or so as to require them to validate the exams."

With respect to plaintiffs' other main contentions, the court held that the defendants had a compelling state interest to identify attorneys, and thus that requiring applicants to submit photographs of themselves prior to taking the examination does not "violate their constitutional rights"; however, the court declined to consider the constitutionality of procedures (particularly a personal interview) applied to applicants petitioning to take the examine for a fourth time, following three attempts as of right, because "no Plaintiff in this lawsuit has the standing to raise the question".

Appellants' points of appeal are

1) that the trial judge applied an erroneous legal standard in refusing to recuse himself;

2) that plaintiffs Jones, Gray and the ABLA should not have been dismissed from the suit for lack of standing;

3) that summary judgment was inappropriate, because discovery was incomplete and there were material issues of fact;

4) that the unvalidated bar examination, which fails blacks in disproportionately high numbers, is insufficiently job-related to be constitutional;

5) that the requirement of a photograph, as part of the application to take the bar examination, is unconstitutional;

6) that the procedures governing petitions to take the bar examination for a fourth time are arbitrary and capricious, and thus violate the appellants' right to due process of law.

Because we conclude that the appellants should prevail on their first ground, we discuss only that and the question relating to the parties to appeal.

## I. PARTIES TO APPEAL

Before discussing appellants' contentions, it is necessary to dispose of a jurisdictional objection raised by the appellees in their brief. Appellees argue that only appellants Alfredo Parrish and Henry Thompson are properly before this Court, because the plaintiffs' notice of appeal and amended notice of appeal expressly named only Parrish and Thompson.[2] However, although Parrish and Thompson are the only parties named in the text of the notices, the captions of the notices named "ALFREDO G. PARRISH, ET AL., Plaintiffs."

The Federal Rules of Appellate Procedure require that "The notice of appeal shall specify the party or parties taking the appeal." Rule 3(c). The objective of this provision, and of Rule 3 generally, is two-fold: to notify the Court of the taking of an appeal, and to notify the opposing party of the taking of the appeal. Cobb v. Lewis, 488 F.2d 41, 45 (5th Cir. 1974). There can be no doubt that the caption, if not necessarily

2. Strictly speaking, the plaintiffs' appeal is also technically defective because it is taken from the order of the trial court and not from a judgment "set forth on a separate document" as required by the Federal Rules of Civil Procedure, Rule 58 (as amended July 1, 1963). This defect is not fatal: we assumed jurisdiction in identical circumstances in Markham v. Holt, 369 F.2d 940, 942 (5th Cir. 1966).

the text, put defendants on notice that all of the plaintiffs intended to take appeal. Appellees have not shown that they were prejudiced or mis-led in any way by appellants' technical non-compliance with Rule 3(c).

Although some other circuits may take a much more formalistic view,[3] this Court has long held that irregularities in form or procedure in filing a notice of appeal will be disregarded, when the interests of substantive justice requires it, as long as there is "substantial compliance with the rules." Des Isles v. Evans, 225 F.2d 235, 236 (5th Cir. 1955). *See also* Crump v. Hill, 104 F.2d 36, 37–38 (5th Cir. 1939) ; Jones v. Chaney & James Construction Co., 399 F.2d 84, 86 (5th Cir. 1968) ; Cobb v. Lewis, *supra,* 488 F.2d at 44–46. As we said in *Jones,* 399 F.2d at 86:

> "The notice of appeal . . . should not be used as a 'trap for unwary draftsmen', Wright, Federal Courts, § 104 at 406 (1963) ; and decisions on merits should not be avoided on the basis of 'mere technicalities', Foman v. Davis, (1962) 371 U.S. 178, 181 [83 S.Ct. 227, 9 L.Ed.2d 222]."

Therefore, we hold that there was adequate compliance with Rule 3(c) to put the defendants on notice that all plaintiffs intended to appeal, and that all eight named plaintiffs and the ABLA are properly before this Court. Accordingly, we proceed to the merits.

## II. STANDARD FOR RECUSAL

The first point raised by appellants is that the trial judge applied an erroneous legal standard in refusing to recuse himself after an affidavit had been filed pursuant to 28 U.S.C. § 144. Section 144 provides in full:

> "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is

pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

The procedure prescribed by section 144 was not strictly followed in this case. It appears from the record that counsel for the appellants and the trial judge informally discussed the question of recusal over a month after the complaint was filed. The court later convened a hearing on December 22, 1972, to discuss the question. The judge permitted plaintiffs' counsel to question him at length at this hearing, after stating to counsel:

> "Heretofore I had felt that a judge should recuse himself very quickly because it made the court appear more fair, but there are other obligations the court owes and I am afraid that I shan't recuse myself but I want to give you an opportunity to put anything on record that you would like to put on record."

The section 144 affidavit was not filed until January 19, 1973. Without entering a formal order, the trial judge concluded that he should hear the case. Since it is apparent that the facts recited in the affidavit were developed to some extent from the preceding hearing, it is necessary to consider both the affidavit and the hearing in determining whether legally sufficient facts were presented to warrant recusal.

---

3. Cook and Sons Equipment, Inc. v. Killen, 277 F.2d 607, 609 (9th Cir. 1960) ; Van Hoose v. Eidson, 450 F.2d 746, 747 (6th Cir. 1971). *Compare* Knuth v. Erie-Crawford Dairy Corp. Association, 395 F.2d 420, 427–428 (3rd Cir. 1968).

The affidavit was filed by plaintiff-appellant Thompson, who alleged two facts and reasons for his belief that the trial judge, Judge Robert E. Varner, had personal bias and prejudice in connection with the proceedings: [4]

1) that while Judge Varner was President of the Montgomery County Bar Association two years ago, the Association had a clause in its by-laws barring black members and that the judge never made any effort to invite black lawyers whom he knew to join;

2) that Judge Varner was acquainted with several defendants in the suit and all of defendants' counsel, and that he said he did not believe that any of the defendants whom he knew would intentionally misrepresent any of the matters related to the lawsuit.

In support of his affidavit, Thompson appended a transcript of the preceding hearing.

Both of the grounds for recusal set out in the affidavit were fully developed at the hearing. Judge Varner stated that he first became aware of the

"whites only" clause in the by-laws of the Association when it was mentioned in a newspaper article speculating on the possibility of his appointment to a federal judgeship. Counsel for the appellants, Mr. Clemon, asked the judge if he then recommended removal of the clause, and the following dialogue ensued:

"THE COURT: My recollection is that I did not recommend anything but that I appointed a committee for a consideration of renovation of . . . the by-laws. . . . Frankly, when I looked at it I was appalled how out of date the whole thing was, not just to racial matters. . . . I believe there were several things in the . . . by-laws . . . that drew my attention and really shocked me. And I did not make any recommendation about it but I did appoint a committee to consider it, and the by-laws, as I recall it, were changed. . . .

"MR. CLEMON: After you appointed that committee did it make a report during your tenure in office?

"THE COURT: Oh, yes.

"MR. CLEMON: It did?

4. The affidavit, which includes the requisite certificate of good faith signed by one of plaintiff-appellant's counsel, reads in pertinent part:

* * * * *

"3. The facts and reasons for the belief that such personal bias and prejudice exist are as follows:

a. The instant action complaints, *inter alia*, that the defendants maintain a policy of excluding blacks from the practice of law in the State of Alabama. The Honorable Robert E. Varner is presently a member of the Montgomery County (Alabama) Bar Association; and when he served as President of that Association two years ago, black lawyers were excluded from membership in the said association under terms of its by-laws. The Honorable Judge Varner was then acquainted with five or six black lawyers who then practiced in Montgomery; but he never made an effort to invite them to join the Association. It was only after the aforesaid judge became interested in a federal judgeship that he, as president of the Montgomery County Bar Association, appointed a committee to revise the said by-laws; and the record is unclear as to whether the 'white only' membership clause of the Montgomery County Bar As-

sociation was removed during his tenure as president of the aforesaid association. b. None of the plaintiffs in this case are personally acquainted with the Honorable Robert E. Varner. The said judge considers the defendant commissioner Hill as a personal friend; he is a friend of Reginal Hamner, one of the chief defendants in the case; he is a friend of John Scott, defendant Hamner's predecessor in office and proposed to be called by the plaintiffs as an adverse witness; he is also a friend of counsel for all of the defendants. Further the said judge is personally acquainted with many of the other defendants in this cause. Although the testimony of the witnesses at the trial of this cause is expected to be conflicting in nature, the aforesaid Judge Varner has indicated that he does not believe that any of the defendants with whom he is acquainted would intentionally misrepresent any of the matters related to this lawsuit. Thus, plaintiffs sincerely believe that where the judge is called upon to make credibility choices throughout the trial, as he will be, he will attach undue weight to the testimony of his friends and acquaintances, all to the detriment of the plaintiffs and the class which they represent."

505 F. 2d—2

"THE COURT: Yes.

"MR. CLEMON: Do you recall what recommendations if any were made with respect to the racially exclusionary clause?

"THE COURT: Yes. It was removed.

"MR. CLEMON: During your tenure as president?

"THE COURT: Well, I am speaking from recollection. It may have been after my tenure; but I think it was during my tenure. I am not sure."

During other discussions at the hearing, Judge Varner stated that he personally knew ten of the thirteen defendant bar examiners. He said that of the ten, he knew three only "slightly". He added that he did not know three of the other examiners at all. He admitted that he has known defendant Reginald Hamner, who is secretary of the bar association and of the board of bar examiners,[5] "ever since he became associated with the bar association." Mr. Clemon asked what effect these friendships or acquaintanceships would have on the judge's conduct of the trial:

"MR. CLEMON: Judge, do you think that in the event there was testimony—conflicting testimony involving a witness whom you didn't know and one of the defendants whom you have indicated that you do know, slightly or otherwise, that there might be any problem in your attaching more weight to the testimony of the person that you know rather than the person that you did not know?

"THE COURT: Well, it would depend on who the person I did not know, maybe, and what the evidence shows. I will say this, of the people I know here, I have no reason to think any of them would intentionally misrepresent anything. I am sure there will be some mistake in recollection, and certainly I would expect most witness to make a few mistakes in their recollection if the testimony becomes complicated.

"MR. CLEMON: Yes, sir.

"THE COURT: But I do not think I would have any prejudice or bias about that matter. Certainly—or any other matter for that matter, frankly. I have thought about the matter thoroughly, and I don't think that there is any reason why I can't fairly judge this case."

At another point, Mr. Clemon asked Judge Varner whether his friendship for over twenty years with former bar association secretary John Scott would influence the weight to which he might attach to Scott's testimony.[6] Judge Varner replied: "I don't think so. I will say this, I think Mr. Scott is an honorable man but I don't think his memory is infallible. I think he would try to tell you the truth in his answers. But if he appeared to evade I think I could detect it."

Thus, in summary, we have a challenge to the judge assigned to try this case alleging discrimination on account of race in the grading of bar examinations on the basis of the following factual setting: the lawyer for the plaintiffs and counsel for the defendants had held conversations

---

5. Mr. Hamner, as secretary of the bar association and the Board of Bar Examiners, was the official in whose custody were all of the papers relating to the bar examinations. He had the application with pictures attached; he assigned the identifying numbers to the examinees; and he received the completed examinations before distributing them to the examiners for grading. He did not testify in person, but submitted an affidavit to the effect that he did not take advantage of this potential means of identifying the examinees by race.

6. Mr. Scott was secretary of the state bar association and the Board of Bar Examiners until approximately four years ago, when he was replaced by Mr. Hamner. In those capacities, Mr. Scott performed the same duties as outlined in footnote 5, *supra*. Mr. Scott's testimony would have been relevant to the plaintiffs' assertion that the defendants maintained a *longstanding* practice and policy of racial discrimination in procedures governing admission to the bar.

off the record in the judge's chambers, apparently discussing the doubts that were in the minds of plaintiffs.[7] At this time no affidavit under section 144 had been filed. In effect, plaintiffs were undertaking to develop a basis for determining whether to file such an affidavit. The hearing conducted was in the form of questions and answers put to the judge by Mr. Clemon, counsel for the plaintiffs. This hearing developed the fact that the judge had been president of the Montgomery Bar Association shortly prior to being appointed to the bench and that at the time the rules of the Association forbade admission of black lawyers. When comment had been made in the public press about this fact and of Judge Varner's being considered for appointment to the United States Court, he appointed a commission to review the bar association by-laws, but gave no direction or suggestion that the racial restrictions be changed. They were subsequently changed, at a time which the judge thought was during his term of office, but as to this he was not certain. Judge Varner was acquainted with ten of the thirteen defendants who were members of the Board of Bar Examiners, three only slightly and several on a basis of what he considered friendship. Three of them he did not know at all. When asked as to the effect of his acquaintance or friendship with defendants in the event of a possible conflict in testimony in the anticipated hearings, Judge Varner, by the language quoted above, indicated a strong feeling of confidence in the veracity and trustworthiness of his friends. When asked expressly with respect to Mr. Scott, who had previously been secretary of the commission, and thus the one person who had custody of all of the documents, he expressed similar confidence in his likely credibility, noting that "if [Scott] appeared to evade I think I could detect it ." [8]

Upon subsequently filing the affidavit, plaintiffs attached a transcript of the hearing before Judge Varner, so that we consider the section 144 affidavit to include all of the facts which are recited above. Interestingly enough, by the time the affidavit was filed in January, 1973, Judge Varner had, in effect, already decided the issue. For, as noted above he stated, before the facts were developed, "I am afraid that I shan't recuse myself but I want to give you an opportunity to put anything on record that you would like to put on record." This sounds very much as though he was intending to permit the plaintiffs to build up a record for appeal, having already decided the matter on the merits against recusing himself. This statement, having been made prior to the filing of the affidavit, must be considered as one of the "facts and reasons for the belief that bias or prejudice exists" within the language of section 144.

Entirely aside, however, from the apparent prejudgment of the issue just mentioned, we conclude that the other facts stated in the affidavit, and supported by the testimony of the hear-

---

7. The transcript of the December 22nd hearing shows the following:

"Gentlemen, you may want to have a seat at counsel table. I asked my court reporter to stay here this morning because, Mr. Clemon, (counsel for plaintiffs) I thought perhaps you would like to put *some elements of our conversation on the record in regard to your question of whether or not I should recuse myself.* I will have to say that I decided in cases earlier this week that these courts have been very reluctant about letting judges recuse themselves and I have really changed my attitude about it in the last two or three weeks. Heretofore, I had felt that a judge should recuse himself very quickly because it made the court appear more fair, but there are other obligations that the court owes *and I am afraid that I shan't recuse myself* but I want to give you an opportunity to put anything on record that you would like to put on record." (Emphasis supplied).

8. It is of significance that none of these persons appeared to testify personally. The motion for summary judgment was based solely upon their affidavits. There, of course, were no opportunities to make any credibility choices by use of the normal standards available to a trial judge.

ing, taken as true, as they must be, for the purpose of the judge's consideration of the motion, Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) are legally sufficient to give "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Berger, supra* 255 U.S. at 33–34, 41 S.Ct. at 233.

▮ The applicable standards for determining the legal sufficiency of the affidavit provided under section 144 are definitively set out in the *Berger* case. The Court at 32 of 255 U.S., at 232 of 41 S.Ct., quoted from an opinion of this Court in Henry v. Speer, 201 F. 869 (5th Cir.) which said:

> "Upon the making and filing by a party of an affidavit under the provisions of section 21 [predecessor of section 144], of necessity there is imposed upon the judge the duty of examining the affidavit to determine *whether or not it is the affidavit specified and required by the statute and to determine its legal sufficiency.* If he finds it to be legally sufficient then he has no other or further duty to perform than that prescribed in section 20 of the Judicial Code. He is relieved from the delicate and trying duty of deciding upon the question of his own disqualification." (Emphasis supplied).

The Court then explains what it means by "legal sufficiency". Speaking again of the definition in Henry v. Speer, *supra,* the Court said at 33–34 of 255 U.S., at 233 of 41 S.Ct.:

> "It is a precaution against abuse, removes the averments and belief from the irresponsibility of unsupported opinion, and adds to the certificate of counsel the supplementary aid of the

penalties attached to perjury. Nor do we think that this view gives room for frivolous affidavits. Of course the reasons and facts for the belief the litigant entertains are an essential part of the 'affidavit, *and must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment.*" (Emphasis supplied).

The *Berger* case was decided by the Supreme Court on a certified question from the Court of Appeals for the Seventh Circuit, and was designed expressly and explicitly to answer the very question that is presented here. The language of the section[9] clearly suggests that the *belief* of the affiant if supported by the facts he or she swears to, is crucial and thus that the test of the affidavit's legal sufficiency should be whether the facts alleged could reasonably lead to the belief that the affidavit says exists in the minds of the plaintiffs. *Berger* supports this approach. *See* Note, Disqualification of Judges for Bias in the Federal Courts, 79 Harv.L. Rev. 1435, 1446–47 (1966).[10] It is true that some post-*Berger* cases have adopted a different test, one that would virtually require that the facts—taken, of course, as true—are sufficient to demonstrate a personal bias or prejudice *in fact* on the part of the trial judge for or against one of the parties.[11]

The only case in this Circuit that discusses the matter is Simmons v. United States, 89 F.2d 591 (5th Cir., 1937), upon which the appellees here rely. In *Simmons,* the affiant alleged that the trial judge had represented a potential witness and the relative of a potential witness, and that the trial judge was "friendly [sic] inclined" toward them.

---

9. I. e., "The affidavit shall state the facts and the reasons *for the belief* that bias or prejudice exists . . . (Emphasis added)."

10. "A formulation . . . in keeping with the purpose of the statute would require only that the facts alleged must justify a reasonable apprehension on the part of the affiant that the judge may be biased [Footnote omitted]. This formulation shifts the emphasis from the judge's actual state of mind to the reasonableness of the litigant's fear, an emphasis at least supported, and possibly required, by the statutory language . . . ."

11. *See* Note, Disqualification of a Federal District Judge for Bias—the Standard under Section 144, 57 Minn.L.Rev. 749, 758 (1973).

The Court held: "However, it is settled that an affidavit of disqualification under the section must state facts showing the personal prejudice of the judge against the defendant and not baseless conclusions." 89 F.2d at 592. This formulation of the rule is correct, as far as it goes. However, it fails to distinguish between *testing* the facts to see if they 1) support the reasonableness of the affiant's belief, or 2) reasonably support a determination that bias or prejudice *in fact* exists. Because the language in *Simmons* does not rule out the possibility of the first interpretation, we therefore think there is no precedent in this Circuit which holds that the affidavit *must* be measured for sufficiency by a standard of actual, rather than the existence of a reasonable belief in, bias or prejudice on the part of the trial judge. Thus, *Simmons* fails to provide the necessary guidance for determining completely the issue before us.

More instructive, it seems to us, as to the attitude that should be taken with respect to the treatment of a claim of bias or prejudice is the decision and language of this Court in United States v. Columbia Broadcasting System, Inc., 497 F.2d 107 (5th Cir. 1974). Although that case dealt with the trial by a judge who had ordered contempt charges filed against the respondent, the guarantee to a party of a fair and impartial tribunal, as stated in that case are no different than they are here. The court said at 109:

"The recondite niceties of contempt law coupled with the strange milieu of a judge passing on the clarity of his own orders, which had to be substantiated largely by his own legal staff, should make us particularly sensitive *to the demands of justice, and more particularly, to the appearance of justice*. The guarantee to the defendant of a totally fair and impartial tribunal, and the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." (Emphasis supplied).

We conclude that a trial court cannot be free from "any hint or appearance of bias" unless a party's sworn *belief* of the existence of bias, supported by substantial facts, is of primary concern. Thus, we reject as invalid the so-called objective test.[12]

In summary, it was not the function of the trial court to weigh the facts, largely developed by his own testimony when relating his relationships with the Montgomery Bar Association and with some ten of the defendants. Under the standards long ago set down in this Circuit, and adopted by the Supreme Court in *Berger,* his only function under section 144 was to determine whether the facts asserted gave "fair support to the *charge* of a bent of mind that may prevent or impede impartiality of judgment." [Emphasis supplied.] As stated in Henry v. Speer, *supra,* and reiterated by the Supreme Court in *Berger, supra,* "He is relieved from the delicate and trying duty of deciding upon the question of his own disqualification." 255 U.S. at 32, 41 S.Ct. at 232.

The judge's preliminary statement that he "was afraid that I shan't recuse myself" and his repetition twice subsequently, when commenting on the problem arising from his friendship with some of the defendants, of his opinion that he was neither biased nor prejudiced and that there was nothing to prevent him from trying the case fairly, all as set out above, make it clear beyond a doubt that the court believed it was his duty to decide the issue as to whether or not he was actually biased, rather than to restrict his consideration to the question whether there was a reasonable basis alleged for the belief of the plaintiffs or even that there was a reasonable basis for the *charge* that he was in fact prejudiced for or against one of the parties.

While we deeply regret the necessity of further proceedings in a case which

12. *See* footnote 11, *supra.*

has been argued fully on the merits in this Court, we are required to give proper attention to the appellants' initial contention that the trial court used an improper standard in determining whether he should recuse himself. Having concluded that a mistaken standard was used, in that the trial judge did not address himself at all to the question of the sufficiency of the allegations, we conclude that the judgment must be reversed. Moreover, we are satisfied that the affidavit and the supporting facts, as here outlined, do meet the standard of section 144 and that under the circumstances the trial judge had no course of action but to follow the procedure set out in the statute, which says that under such circumstances "such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.