695 F.2d 1328
 1982-83 Trade Cases 65,147
 PORT TERMINAL & WAREHOUSING COMPANY, a Georgia Corporation
and McKinney International Forwarders, Inc., a
Georgia Corporation, Plaintiffs-Appellees,
v.
JOHN S. JAMES CO., D.J. Powers Co., Inc., Thomas C. James,
William Earnest Carter, Defendants-Appellants.
PORT TERMINAL & WAREHOUSING COMPANY, etc., et al.,
v.
JOHN S. JAMES CO., et al., Defendants-Appellants.
 Nos. 81-7375, 81-7520 and 81-8013.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 17, 1983.
 
 Albert N. Remler, Remler & Henderson, DeVaul L. Henderson, Savannah, Ga., for defendants-appellants.
 Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, P.C., W. Brooks Stillwell, III, Leonard J. Panzitta, Savannah, Ga., for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before RONEY and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 This is an appeal from judgments of the district court for the Southern District of Georgia based on a jury verdict finding a conspiracy in violation of Sec. 1 of the Sherman Act and the court's denial of the appellants' motion for a new trial based on their contention that there had been an insufficient inquiry into alleged jury tampering.
 
 I. STATEMENT OF THE CASE
 
 2
 The jury had before it the following evidence upon which to base its verdict. Plaintiffs-appellees are Port Terminal and Warehousing Company and McKinney International Forwarders, Inc. both of which are Georgia corporations owned and managed by J. Allen McKinney. Port Terminal has been an ICC trucking terminal in Savannah, Georgia for 25 years. It served as the non-exclusive local cartage and storage agent for three ICC certificated trucking companies, Carolina Freight Systems, Bruce Johnson Trucking Co., Inc. and American Freight Systems, all three of which were defendants in this action. In 1979, McKinney International Forwarders applied to the Federal Maritime Commission for a foreign freight forwarder license. Foreign freight forwarders are like "travel agents" for exported goods. They arrange for passage of goods going abroad and often contract with trucking companies for hauling by ICC freight companies from the place of manufacture to the port.
 
 
 3
 Defendants John S. James Company and C.J. Powers Company, and their respective presidents, James and Carter, also defendants in this action, are licensed foreign freight forwarders and custom house brokers in Savannah. Savannah has a small number of such businesses who do not solicit the accounts of competitors or engage in price competition. In spite of comments to the FMC on McKinney International Forwarders' application for a license, the FMC granted it in early October, 1979.
 
 
 4
 Thereafter, MIF solicited customers for its new business at a foreign trade conference in Savannah in the fall of that year. Both Carter and James regarded these activities as "unseemly" and, in a discussion on the custom house steps, Carter said he would write to American Freight Systems, Bruce Johnson Trucking Company and Carolina Freight Systems to slow down MIF's operation. James revealed he had already done so. Later Carter spoke by telephone with James Black, president of Frank Richards, Inc. of Georgia. Black said he would write letters to the same three companies, which he did on October 29. Within 20 days of MIF's licensing, Carter, James and Black had each written letters to each of Port Terminal's customers claiming that they could no longer do business with the addressee trucking company so long as it continued to use Port Terminal as its agent and would recommend that their clients do the same.[1] There was evidence that at a meeting of the Brokers Association in early December, 1979, Carter told McKinney that the "boycott" would continue until McKinney gave up his freight forwarding business. Within several months of the time the letters were sent, Port Terminal's agency relations with all three of its customers had been terminated. Bruce Johnson Trucking rented Port Terminal's terminal building and subleased a section to American Freight Systems. MIF never got its operations started. McKinney's companies thereafter filed their original complaint in February, 1980, alleging that the freight forwarder defendants engaged in a group boycott of the trucking companies' doing business at Port Terminal to coerce McKinney to abandon plans for MIF to enter into competition with the defendants as a foreign freight forwarder.
 
 
 5
 The case was submitted to the jury upon special interrogatories. The jury answered affirmatively to each of the two questions:
 
 
 6
 1. Do you find by a preponderance of the evidence that there was a conspiracy or combination between the defendants, or any of them, for the purpose or effect of which was to prevent McKinney International Forwarders, Inc. from entering into competition in the foreign freight forwarding business in Savannah, Georgia?
 
 
 7
 3. Do you find by a preponderance of the evidence that the conspiracy or combination was a substantial factor in the damage if any, to the business of Port Terminal and Warehousing Company?
 
 
 8
 Interrogatory No. 2 required the jury to state the name of each "participant in the conspirator combination." The jury answered that each of the named defendants was a participant.
 
 
 9
 Finally, the jury responded to question No. 4 "what is the amount of damages to Port Terminal and Warehousing Company, if any, caused by the conspiracies or combination" by answering $158,500. This sum was trebled, and credit was given against the resulting figure for amounts received by Port Terminal in settling with dismissed defendants Carolina Freight Carriers Corporation, American Freight Systems, Inc., and Bruce Johnson Trucking Company, Inc. The court later granted an injunction in favor of MIF and fixed attorney's fees and costs in the sum of $141,167.34.
 
 
 10
 At a pretrial conference held November 14, 1980, the court set February 15, 1981 as the last day for discovery. On February 24, 1981, less than three weeks before the date of trial, defendants notified plaintiffs of several additional witnesses, the use of some of which, most particularly the academic valuation expert, the court prohibited by order of March 2, 1981.
 
 
 11
 On April 12, 1981, McKinney learned from juror Rawlings of an approach to him that he swing the case in favor of defendant James in return for a bribe of from $5,000 to $10,000. McKinney notified his lawyer who notified the court the following day. Thereafter, the court commissioned the FBI to conduct an investigation of the incident. The court notified defendant's counsel of the issue on May 29 and prohibited their disclosing this information to anyone other than attorneys in their firm. Defendant's counsel by letters of June 2 and June 10 notified the court of the difficulties in representing their clients imposed by this order. At 11:30 a.m. on June 18, 1981, the defendant's counsel were notified of a post-trial hearing at 1:30 p.m. that day, at which the court conducted an investigation of the alleged incidents. Counsel were permitted to disclose this information to their clients before that hearing. The hearing was continued to June 22. Following the hearing on June 22, the court ordered the records sealed and the defendants did not see the FBI report. The court stated that one of the reasons for holding the hearing was to give the parties an opportunity to move for a new trial if they saw fit to do so. On July 30, 1981, the defendants moved for a new trial on the grounds of jury misconduct. By order of October 9, 1981, the court unsealed the record and allowed a 10 day investigation into the jury tampering issue, but still would not permit the interviewing of jurors or the examination of the FBI report. The court denied the defendant's motion for an extension of time for the investigation. No further hearing was held and on November 13, 1981, the court found that there was no jury prejudice and denied defendant's motion for a new trial. 92 F.R.D. 100.
 
 
 12
 Defendants James Company, Powers Company, James and Carter together filed three appeals from the findings of an antitrust conspiracy, the award of attorney's fees, and the denial of their motion for a new trial. These three appeals were consolidated for this disposition.
 
 II. ISSUES ON APPEAL
 
 13
 These three appeals raise the following issues:
 
 
 14
 A. Substantive antitrust issues--
 
 
 15
 1. Did the plaintiffs fail to prove, by substantial evidence, the existence of an illegal conspiracy among the defendants?
 
 
 16
 2. Did the plaintiffs fail to prove, by substantial evidence, that the alleged illegal acts of the defendants caused the termination of plaintiff's contracts with its customers?
 
 
 17
 3. Did the plaintiffs fail to prove, by substantial evidence, that they suffered any damages as the result of the defendants' actions?
 
 
 18
 B. Did the district court abuse its discretion by excluding the testimony of certain of appellants' expert witnesses?
 
 
 19
 C. Did the district court abuse its discretion by failing to remove an allegedly biased juror from the panel?
 
 
 20
 D. Did the district court err by not deducting from the award of attorneys' fees time spent by plaintiffs in prosecuting defendants with whom they later settled?
 
 E. Issues involving jury tampering:
 
 21
 1. Did the district court's handling of the jury tampering charges deprive defendants of their due process rights?
 
 
 22
 2. Did the district court abuse its discretion by refusing to grant defendants' motion for an extension of time in which to further investigate the jury tampering charge?
 
 
 23
 3. Did the district court err in not granting defendants' motion for a new trial due to jury tampering and misconduct?
 
 III. DISCUSSION OF ISSUES
 A. Substantive Antitrust Issues
 1. Existence of conspiracy
 
 24
 The district court found that, considering the meetings between Carter and Black and Carter and James and the virtually identical language of the letters sent by these three defendants to each trucking client, there was "overwhelming evidence of a conspiracy." This finding was made by the court in connection with the request for an injunction as to which the court made findings of fact and conclusions of law. It is clear that the jury's verdicts as to the existence of the conspiracy, being based on the same evidence upon which the court made its findings, were thus adequately supported.
 
 
 25
 The procedural posture of this case, also, strictly limits our power to consider the sufficiency of the evidence. Appellants made a motion for a directed verdict only as to two issues: As to proof of damages and as to present current existence of MIF and its entitlement to an injunction. No motion for directed verdict was made as to the existence of the conspiracy. Thus, our review of the sufficiency of the evidence regarding this issue is consequently foreclosed. We may inquire whether there was any evidence supporting the submission of this issue and the jury's finding in favor of the plaintiffs, but we may not question the sufficiency of whatever evidence we do find. Little v. Bankers Life & Casualty Co., 426 F.2d 509 (5th Cir.1970), citing Hoover, Inc. v. McCullough Industries, Inc., (5th Cir.1967), 380 F.2d 798, 801. As we have indicated there was much more than "some" evidence to support the jury's verdict.
 
 2. Proof of causation
 
 26
 The same procedural defect exists with respect to our consideration of the appellants' contention that the conspiracy which the jury found caused the termination of plaintiffs' contracts with its customers. Defendants did not attack the sufficiency of the evidence of causation in their motion for a directed verdict. The evidence of the loss by Port Terminal of the business of the three shipper defendants within a few months and the avowed purpose of Carter and James, participated in by the other defendants, was also more than "some" evidence that the injury to Port Terminal and MIF was caused by the boycott. The jury's verdict with respect to this issue must also stand. Little v. Bankers Life & Casualty Co., supra. See also Scheib v. Williams-McWilliams Co., Inc., 628 F.2d 509 (5th Cir.1980).
 
 3. Proof of damages
 
 27
 As to the proper proof of damages this court's standard of review is different. Defendants moved for a directed verdict on the ground that "the plaintiffs have not presented evidence of damages required by the Fifth Circuit Court of Appeals in antitrust cases involving treble damages," citing Kestenbaum v. Falstaff Brewing Co., 514 F.2d 690 (5th Cir.1975) and also the same case at 575 F.2d 564 (5th Cir.1978). We, therefore, review the evidence with respect to damages under the standard of Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969). In that case, the Court of Appeals for the Fifth Circuit said: "If there is substantial evidence opposed to the motion [for a directed verdict] that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury." Boeing Co. v. Shipman, supra, at 374.
 
 
 28
 Plaintiffs' expert witness, Carpenter, arrived at a figure which he denominated "operating earning power (includes good will)" of $158,500, a figure which was adopted by the jury and then trebled by the court as required in the statute. He arrived at this figure in the following manner: he averaged the gross revenue figures for the last three years of operation of Port Terminal and obtained a figure of $345,985. From this he deducted average operating expenses (including salary) of $311,565 showing an item called "income from operations" of $34,420. To this he added a figure denominated "compensation paid to Allen McKinney [president] in excess of normal salary paid to a competent terminal manager ($49,800 X $25,000) or $24,800." From these two sums, he then deducted a figure which he called "earnings value of fixed assets (after subtracting expenses)" of $27,500. This total, rounding all of the numbers out to the nearest $100 came to $31,700 which he called "operating earning power (per year)." He then multiplied this figure by 10 as representing the "present fair market value of future operating earning power if risk free business" for a total of $317,000, but then from that figure he deducted what he called a "risk" factor of 50 percent, leaving what he called "lost earning power" of $158,500. He testified that this figure was the value of the good will which Port Terminal lost following the termination of its business.
 
 
 29
 The defendants' motion for a directed verdict dealing with the question of damages spoke only in terms of a failure by Carpenter to "take into account certain items of capital that were out there at Port Terminal in 1979. Specifically, he stated that he did not know about, and did not take into account, a fuel tank, a 4,000 gallon fuel tank, which Mr. McKinney has admitted was owned by the corporation, which our experts placed a value of $2,000 upon, which would generate a certain return based upon a safe rate of return under these cases. He did not take into account a Cadillac automobile owned by the corporation that is still driven by Mr. McKinney. That's a capital item of the corporation. A return should have been computed on that. He also did not take into account another valuable trailer out there, a trailer to be pulled by a tractor which Mr. McKinney estimated is worth $2,500. Furthermore, he stated that he did not include the $1,200 a year office trailer rent in his computations because he did not regard them--he did not regard a three year lease as a significant lease. In fact, Your Honor, he admitted that at the time he formed his conclusions, he did not know about the $1,200 a year office trailer."[2] Now, on appeal the defendants contend that there was a failure of proof of the nature required by Kestenbaum because although Carpenter deducted from the operating earnings the rental value of the terminal building, "he failed to likewise deduct the rental income received on the office trailer and the reasonable return on the sum representing the value of Port Terminal's office furniture, trucks, trailers and related equipment."
 
 
 30
 Appellants nowhere in their briefs direct our attention to any place where testimony was given as to the need in the operation of Port Terminal of these items, whether, for instance, the 4,000 gallon fuel tank or the "Cadillac automobile owned by the corporation that is still driven by Mr. McKinney" or any other items would be essential to the operation of the business.
 
 
 31
 In any event, although not spelled out by the appellants, a careful reading of the record discloses that there was an apparent agreement by the witnesses that it would be appropriate for such a company to have a revolving fund equal to $25,000 in an operating account. Carpenter, however, testified at length that in his opinion, any company that left that sum without investing it at least at savings account interest would be "stupid." Therefore, in his opinion, no additional deduction should be made from the annual operating income to make allowance for the return on the $25,000. We think that the opinion thus expressed by Carpenter is fully acceptable in light of the fact that the record discloses net operating profits over the five year period greatly in excess of the expenses. This, of course, means that the cash flow of the company might well have permitted it to rent or lease any of the "other items of capital that were out there at Port Terminal in 1979" if they were needed. This, then, simply became a contest of expert witnesses without having anyone state that any of these items was or would be actually needed in the operation of the business. Under the somewhat relaxed requirements of specificity of proof of damages in antitrust cases, Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1976) and Malcolm v. Marathon Oil Co., 642 F.2d 845 (5th Cir.1981), we conclude that this element of the Kestenbaum requirements was supplied.
 
 
 32
 So, too, with respect to the Kestenbaum requirement that the court consider whether the prospective profit figure will reasonably continue into the future. Such an estimate made by expert witnesses traditionally used in this kind of a case is necessarily much less accurate than the proof of what has happened in the past. Carpenter's opinion, based as it was on the fact that the three carrier contracts which had produced such substantial profit to Port Terminal over the preceding years upon 30 day terminable contracts or no contracts at all was founded on more than "pure speculation." See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) and Malcolm v. Marathon Oil Co., 642 F.2d 845 (5th Cir.1981). In the Malcolm case we said:
 
 
 33
 In fact, given proof of the fact of damage, proof of losses border on the speculative as allowed in order to facilitate the policy of the antitrust laws. Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 887 (1st Cir.1966); Hobart Bros. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 903 (5th Cir.1973)....
 
 
 34
 Malcolm, supra at 858.
 
 
 35
 B. Exclusion of Testimony of Expert Witnesses
 
 
 36
 At a pretrial conference held on November 14, 1980, the district court directed both parties to conclude all discovery by February 15, 1981, so that a March trial could be scheduled. Many interrogatories were filed and many depositions were taken by both parties to this litigation. The deposition of plaintiffs' principal expert witness on amount of damages was not concluded until February 12, 1981. In the meantime, counsel for the defendants had written the trial court and, although not in the form of a motion, suggested the need for additional time for completing defendants' discovery. No action was taken on this request by the trial court. Thereafter, on February 24, defendants supplemented their responses and included the name of Professor George Jenkins as an expert witness to be called at trial. On the same day, plaintiffs filed their motion to exclude the testimony of Jenkins and eight other witnesses whose names were given to them at the same time. On March 2, 1981, the court issued its order permitting six of the new witnesses to be called but prohibiting three others of whom one was Professor Jenkins. The case went to trial on March 16 without the defendants' academic expert, Jenkins. They claimed that this had a particular prejudicial effect because he was the only "academic" whom they had to testify in their behalf.
 
 
 37
 Both parties agree that the standard of review of a trial court's striking of the name of a witness because of failure to comply with limits imposed on discovery is that a court's ruling to permit or exclude certain evidence will not be disturbed on appeal absent a clear abuse of discretion. We conclude that the trial court's own answer to this motion to exclude these particular witnesses shows a sensitive appreciation of the problem faced by the court and the correctness of its solution under the standard of review open to us. The court's order in this respect follows:
 
 ORDER
 
 38
 Before the Court is Plaintiff's Motion to Exclude the testimony of Certain Expert Witnesses for the reason that these experts were not designated in response to outstanding interrogatories before the termination of discovery on February 15, 1981.
 
 
 39
 In the Court's experience, firm deadlines for discovery are more than helpful to the Court in promoting the just and efficient administration of justice, they are essential. The Court's practice of strict enforcement of discovery deadlines is well known to the attorneys involved. This case has been pending before the Court for more than a year--far longer than the Court normally allows a case to wait for trial. This is not a case in which it is argued that witnesses came to light only at the last moment. These proposed witnesses are experts. Their status as witnesses depends on counsel's decision alone and not on any actual relationship to the underlying controversy. The Court expressly instructed all counsel months ago to proceed with the retention of expert witnesses. Neglecting to supplement the outstanding interrogatories with the names of experts before the close of discovery is inexcusable.
 
 
 40
 Defendants' counsel argue that they could not designate their own experts until after plaintiffs' experts had completed their studies and had been deposed. Defendants cite no authority for the proposition that a party is entitled to wait until the opposing party has completed all of its discovery before proceeding. Here, the damage issues have been known to all parties for months. The underlying data has been available to defendants for months and indeed two persons whom defendants stated they might designate as experts have enjoyed access to this underlying data.
 
 
 41
 Defendants also argue that because some of their newly designated experts have been known to plaintiffs as "possible" witnesses, plaintiffs are not to be prejudiced by the late designation. This argument makes little sense in light of Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure. Knowing that a retained expert is a possible witness is of limited help to a party. The decision to exclude a party's proposed witnesses in such circumstances is within the discretion of the Court. Rule 37(d), Fed.R.Civ.Proc.; Shelak v. White Motor Co., 581 F.2d 1155 (5th Cir.1978); Meyers v. Pennypack Home Ownership Association, 559 F.2d 894 (3rd Cir.1977).
 
 
 42
 Defendants have argued that the appropriate standard to be applied by this Court in exercising its discretion is enunciated in Meyers, supra. That case concerned the situation in which two new fact witnesses were discovered by plaintiff's counsel after the close of discovery and the entry of the pretrial order. Among the factors the Court discussed as relevant were the ability of the party to have discovered the witness earlier, the validity of the excuse offered by the party, and the willfulness of the party's failure to comply with the Court's Order. Meyers, 559 F.2d at 904. Here defendants' excuses are not persuasive. The defendants here were entirely in control of the designation of experts. No inadvertent discovery of an important fact witness was involved. The issues have been known for many months. The late designation was the result of purposeful waiting on the part of defendants' counsel. Here, a crowd of new experts, not only one new witness, is involved.
 
 
 43
 Accordingly, the Court determines that the three witnesses who were mentioned for the first time after the close of discovery may not be called. These are Messrs. Duffy, Ebberwine, and Jenkins.
 
 
 44
 As for the remaining proposed witnesses, the Court will reluctantly allow them to be called in view of their importance. This will necessarily prejudice the plaintiffs to some degree since plaintiffs will be forced, with slightly more than two weeks remaining until trial to take several depositions. Their trial preparation will be disrupted and their remaining time will be burdened. The Court is particularly reluctant to place additional burdens on counsel at this stage since the Court often imposes additional duties on counsel at the pretrial conference, including work on additional fact stipulations, work in regard to resolving differences in proposed charges, etc. However, the remaining newly named witnesses will be allowed. These witnesses will be produced in Savannah at the expense of the defendant who wished to call the witness. Other than any travel expenses, expenses shall be borne by the parties as though the depositions had been taken before the discovery deadline. [Emphasis in original]
 
 
 45
 We find that there was no clear abuse of the trial court's discretion for a reason additional to the apparent care in which the trial court considered this motion. Our reading of the transcript demonstrates that there were two other witnesses who testified that there was negative good will value on the critical date, thus indicating that testimony of two of the witnesses would have been cumulative. As to the third, it would have been cumulative on the issue of whether it would be ethically proper for a freight forwarder to act in the capacity in which the plaintiff sought to act. Other witnesses were available to, and did, give evidence as to these matters.
 
 
 46
 C. Trial Court's Refusal to Remove an Allegedly Biased Juror
 
 
 47
 Following the opening and closing arguments of counsel, defendants filed a motion entitled "motion for mistrial or in the alternative to excuse juror(s)." By such motion defendants moved the court "to declare a mistrial in the within action based upon the conduct of juror no. 33 as described in the affidavits attached hereto and made a part hereof." As a part of such motion, defendants suggested a course of procedure for the court to follow, to-wit: that the court "cause an inquiry to be conducted in chambers with counsel present of all jurors, and in particular juror no. 33 and juror no. 10, to ascertain the misconduct of juror no. 33, and to determine whether such misconduct demonstrates such misconduct which would have prejudiced the entire panel of jurors. In the event the court makes such a determination, defendants move for a mistrial."
 
 
 48
 The affidavits referred to in the motion were submitted by counsel for two of the defendants. The first asserted the following facts:
 
 
 49
 4. Beginning on Thursday, 19 March 1981 after three full days of the trial of this action, I began to perceive a change in the demeanor of a certain white female juror, seated third from the left in the jury box and identified as Mrs. Carolyn Manson, juror no. 33.5. Until the day and time above stated, Mrs. Manson had appeared to listen attentively and impartially to the proceedings in this action. However, on that date she began to show a definite bias and prejudice in favor of any and all remarks made by plaintiff's counsel and against any and all remarks made by counsel for the defense.
 
 
 50
 6. The views and leanings of this juror were manifested by physical signs such as nodding in agreement with plaintiff's counsel, shaking her head in disapproval at defendant's counsel's interrogation of witnesses, making facial expressions indicative of disbelief, including rolling her eyes and putting her hands to her face upon remarks of the defendant's counsel with which she disagreed.
 
 
 51
 7. These manifestations of prejudgment on the part of this juror have increased day by day, to the point that I found her gestures and her physical manifestation of attitude extremely distracting during my closing argument in this action.
 
 
 52
 The affidavit of the other counsel contained the following statements:
 
 
 53
 4. Beginning during the latter part of the first week of trial, I began to notice that a certain juror, identified by the jury list as Mrs. Carolyn P. Manson, and bearing juror identification no. 33 appeared to manifest signs of a prejudgment of the merits of this action.
 
 
 54
 5. This juror's actions included facial gestures, movements of the head, smirks, all indicative of favoring remarks made by plaintiff's counsel and disapproving remarks made by defendant's counsel.
 
 
 55
 6. The demeanor and gestures of this juror continued to be manifested throughout the trial and reached a peak during the final arguments of this cause. At that time this juror's suggestions became so obvious and rude as to be a distraction to counsel for the defense.
 
 
 56
 In addition, an affidavit was supplied by James P. Black, himself a defendant and president of one of the corporate defendants. This affidavit contained the following statements:
 
 
 57
 3. During the course of this trial, which was commenced on 16 March 1981, I have been seated at a table directly across from and facing the jury, approximately 20 feet away from the jury box.
 
 
 58
 4. During the past several days of the trial, I have observed a certain female juror, seated third from the left hand side of the jury box, and identified to me as Mrs. Manson, engaged in numerous distracting activities, including note taking during the argument of plaintiff's counsel, nodding her head in agreement with plaintiff's counsel, and making visual signs of disagreement with defendant's counsel.
 
 
 59
 5. On 23 March 1981 at approximately 5 p.m. when Judge Edenfield was engaged in a conference with all counsel at the side bar, I observed this juror turn to the juror behind her, a black male who has been identified to me as a Mr. Sidney Brown, Sr., and make a statement. From reading her lips, it was my strong impression, and it is my present belief, that she made the following remark to this juror: "I think they're guilty, don't you?"
 
 
 60
 The motion above referred to was made prior to the opening of court the morning following the alleged incidents.
 
 
 61
 The court heard argument from all counsel on the motion and then addressed them as follows:
 
 
 62
 THE COURT: Good morning, Ladies and Gentlemen.
 
 
 63
 We have gotten to the last stage of the proceedings before the case is delivered in your hands under the instructions that the Court will give you.
 
 
 64
 If you recall, when you were first selected, I gave you certain instructions, and I've tried to reemphasize those instructions throughout this trial. I have told you that--I'm paraphrasing--that you are not the advocate of any party; that you're to listen to all of the evidence, and to listen to the Court's instructions, and that at the time that you retire to the jury room, and the Court sends in the evidence--this is additional instructions--it will be your opportunity and your duty to begin your deliberations. But you were to begin this case with all open mind, and you were to remain open until you had heard all of the evidence and the law, and at that time, you were to render your verdict.
 
 
 65
 The case has been somewhat longer, or more lengthy than the average case tried, and the hours that we have worked have been rather lengthy. I think that I've expressed on behalf of the Court and on behalf of the parties from time to time our appreciation and gratitude for your willingness to work and your interest that you have demonstrated in the case. Since it is the last day of the trial, or probably the last day of the trial, I want to inquire of you individually whether there has been any violation of the Court's order, and whether you are still a fit juror under these instructions that I have given you so far. And you may sit where you are, but Mr. Cooper, is there anything you need to tell the Court? Do you feel that there has been any violation of the Court's order?
 
 
 66
 MR. COOPER: No, I don't.
 
 
 67
 THE COURT: Mr. Pace, I'll ask you the same question. Are you still competent within the instructions given to you by the Court?
 
 
 68
 MR. PACE: Yes, Sir.
 
 
 69
 THE COURT: Mrs. Manson, I ask you the same question. Do you feel like that you are still competent under all of the instructions that the Court has given you about being neutral and detached?
 
 
 70
 MRS. MANSON: Yes, I do.
 
 
 71
 The court then addressed each individual juror and the three alternates in the same manner and continued as follows:
 
 
 72
 All right. Now, all of you have demonstrated a willingness to work hard, and you have further demonstrated that you, at this point, this late point in the trial, adhere to the Court's instructions and are willing to abide by them; that you have abided by those instructions, and that justice will be done.
 
 
 73
 The court then proceeded to charge the jury.
 
 Rule 47(b), Fed.R.Civ.P. provides that:
 
 74
 Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.
 
 
 75
 The Court of Appeals for the Fifth Circuit has held that in a criminal case under similar Rule 24(c) of the Fed.R.Crim.P. the question arises under what circumstances and on what grounds is the trial judge justified in taking such action. That is, taking action to replace such a juror. United States v. Smith, 550 F.2d 277 (5th Cir.1977). In answering this question, the court in Smith agreed with the statement from the Court of Appeals for the Third Circuit which said: "... The trial judge in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." United States v. Cameron, 464 F.2d 333, 335 (3rd Cir.1972).
 
 
 76
 It is clear, therefore, that if the trial court in this case had been convinced that the challenged juror was in fact biased, it could in its sound discretion have granted defendants' motion. Appellants have referred us to no case in which any appellate court has found error in the trial court's exercise of its discretion in refusing to excuse a juror on the kind of facial expressions cited in counsel's affidavits or on the affidavit of a party to the action in which he stated that he believed he understood a conversation by reading the lips of the juror from a distance of some 20 feet.
 
 
 77
 We do not find an abuse of discretion by the trial court in its handling of this matter.
 
 
 78
 Nor are we impressed by the argument made by appellants that the nature of the hearing conducted by the court was insufficient to permit him to make his determination not to excuse the juror. In their brief, appellants seem to complain primarily of the failure of the trial court to conduct an inquiry in chambers of each juror separately as to the alleged bias. However, their motion made no such request. As stated above, they moved the court "to cause an inquiry to be conducted in chambers with counsel present of all jurors, and in particular of juror no. 33 and juror no. 10...." The trial court conducted such inquiry, but did so in open court in the manner which has already been set out above. The trial court cannot be faulted for conducting the inquiry in court instead of in chambers.
 
 
 79
 D. Refusal of the District Court to Deduct from the Award of Attorney's Fees Time Spent by Plaintiff in Prosecuting Defendants With Whom They Later Settled
 
 
 80
 The trial court conducted a lengthy hearing as to the amount of attorney's fees to which plaintiffs were entitled under 15 U.S.C. Sec. 15. During the course of that hearing, it became apparent that settlements had been made between the plaintiff and some of the original defendants before judgment. The trial court therefore eliminated from consideration the hours charged by plaintiffs for work performed in the claims against those defendants, thus leaving in the final award the amount which represented the trial court's determination of what represented "a reasonable attorney's fee" for services rendered by them in the case as it stood at the time of the jury's verdict and judgment. Between the date of the judgment, however, and the court's order fixing attorney's fees, plaintiffs settled their claim with another defendant, and subsequent to the court's order fixing fees, with one or two additional named defendants. In these circumstances, the remaining defendants, who included the principal actors in the action condemned by the jury's verdict, claimed that the final judgment for attorney's fees should have been reduced by the amount of the time spent by plaintiff's counsel in prosecuting its claim against the defendant which had settled before the court's order and should be open for deductions thereafter for such settlements as were made following both the final judgment on the merits and the court's judgment on attorney's fees.
 
 
 81
 Appellees respond by claiming in general that all of the efforts they expended against all of the defendants who settled during the course of or after the court's judgment on the merits would have been necessary regardless of whether the particular settling defendants had remained in the lawsuit. They further contend that there is no basis for the court's reducing the amount of attorney's fees to which they are entitled because of acts that occurred following the jury's verdict and judgment on the merits of the conspiracy. They contend that for the court to grant the request of the appellants in this regard would run counter to the teachings of the Supreme Court in Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), in which the Court held there is no contribution among Sherman Act tortfeasors.
 
 
 82
 It seems clear to us that once the jury's verdict had been made the order of the court after the amount of damages had been trebled as required by the statute, the court properly proceeded to determine what would be a reasonable attorney's fee for accomplishing this judgment against the remaining defendants. The fact that the plaintiffs subsequently agreed to pursue their final judgment against less than all of the defendants is the exercise of a privilege that any plaintiff has in a tort action where there is no contribution among the defendants. Nor does the fact that plaintiff gave up the right to pursue the judgment against the particular settlers change this result. We, therefore, find no error in the trial court's judgment for attorney's fees, which is made the subject of one of the separate appeals here.
 
 E. Issues Involving Jury Tampering
 
 83
 Shortly after the trial had concluded on March 24 and judgment entered on March 30, but before the hearing on attorney's fees, the court received the disturbing information from the plaintiff's attorney that information had come to his attention indicating that there may have been an attempt by one of the defendants to influence the jury during the course of the trial. As reported to the court, on April 10, 1981, McKinney, president of both plaintiff corporations, was approached in a bar by Kenneth Rawlings who had served on the jury in the case. Rawlings told McKinney that he had been approached by Dick Hearn, Jr., whose father had testified as an expert witness for the defendants. Juror Rawlings told McKinney that his father had stated that it might be worth $5,000 or, later, $10,000 for him to favor the defendants. Because of a relationship between his father and Thomas James, juror Rawlings believed that James may have been the source of this offer. McKinney immediately informed his attorney who brought the matter to the attention of the court.
 
 
 84
 The court ordered an FBI investigation and on May 29, met with counsel for all remaining parties to inform them of the information received by the court. The results of the FBI investigation were not disclosed to counsel although the court solicited written suggestions as to how to proceed. After receiving these suggestions, the court ordered a post-trial hearing and subpoenaed all members of the jury as well as all the persons which the court later stated had been identified by the FBI investigation as having any knowledge of the alleged misconduct. At the time of the first hearing, the court instructed counsel not to discuss the matter outside their respective law firms even with their clients. The court stated in its final order that this was done to prevent any further communication between the parties and the witnesses. Shortly before the first hearing took place counsel were informed that they might consult with their clients. The hearing was held on June 18 and 22, 1981, which the court stated in its final order was to provide it an opportunity "to strike a balance between the needs of the truth finding process and the necessity of avoiding juror harassment, on the one hand, and affording to defendants the opportunity for participation as guaranteed by the decision in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)...." The record of the proceedings was sealed until the conclusion of the June 22 hearing because two of the important witnesses, juror Shuman to whom Rawlings had commented on the alleged offer and Mr. Hearn, Sr., were not present on June 18. They were questioned on June 22. Thereafter, on October 8, the court unsealed the record and lifted all restrictions except that counsel were ordered not to talk with any former jurors. The court also gave defendants 10 days to make any further investigation they chose. Defendants' counsel filed a motion for an extension of time, which was denied. Defendants thereafter made no further request for a hearing. At the June 18 and 22 hearing, the court itself examined all of the witnesses, inviting counsel to supply such questions as they desired. From the evidence adduced at the hearing, the court concluded in its order issued on November 13, 1981 that there had, in fact, been an improper approach to juror Rawlings by his father, but concluded that the facts were "insufficient to establish by a preponderance of the evidence that Mr. James was aware of, or authorized, or could have discovered through due diligence a plan to influence a juror." There was no hint of the involvement of any other defendant.
 
 
 85
 At the same hearing, the trial court questioned juror Rawlings and the juror who sat next to him named Shuman. Rawlings stated that the conversation with his father he considered to be "a joke" and later that he paid no attention to it and that he and Shuman laughed over it. Shuman testified that he asked Rawlings whether he could prove it and told him "I wouldn't touch it with a 10 foot pole." Both Rawlings and Shuman testified that this telephone communication had no effect on their decision as jurors in the case. Both testified they had not mentioned the matter to any other member of the jury. Each other juror was questioned by the court and verified that they had heard nothing of the telephone conversation between Rawlings and his father. They all testified that no one had approached them and that they had heard of no effort to approach any other member of the jury during its service.
 
 
 86
 Following a hearing and the trial court's conclusion that none of the defendants made any request for a further hearing, other than a request for postponement of the time during which they could investigate the case, the court entered its order of November 13 fully discussing the details of the disclosure, of the hearings it held, of the evidence and the court's duty to deal with it under the circumstances.
 
 
 87
 We agree that the trial court approached the problem in the manner suggested by the Supreme Court in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1953). The Court of Appeals for the Fifth Circuit has faced somewhat the same question that was presented to the trial court here, although in the review of a criminal conviction. In United States v. Phillips, 664 F.2d 971 (5th Cir.1981), the court held that where the court had received evidence of an attempt to bribe a juror sitting in the case and had then excused the juror and had then inquired of all of the jurors in open court as to any knowledge of any outside influences the court could properly conclude that such a contact did not affect the jury. The court stated: "significantly, this court has not adopted a rigid per se rule automatically requiring a reversal of conviction in cases concerning juror misconduct. See United States v. Betner, 489 F.2d 116, 119 (5th Cir.1974). We do require that the trial court determine whether the jury misconduct occurred and whether or not it was clearly prejudicial. Id. United States v. McKinney, 429 F.2d 1019, 1026 (5th Cir.1970)." United States v. Phillips, supra, at 999.
 
 
 88
 So far as has been shown to us, no court has attempted accurately to state precisely what procedures must be followed by the district court in conducting the hearing of the type described in Phillips. A careful consideration of the proceedings conducted by the trial court here convinces us that the court acted well within its discretionary powers in the manner in which the proceedings were conducted and that its conclusion that the "proposal had no effect on either juror and the defendants were not prejudiced" was not clearly erroneous. The trial court further stated: "The court does not regard this conclusion as a close question and further notes that it is reasonably certain that no prejudice occurred."
 
 
 89
 We conclude that the contentions of the appellants with respect to the conducting and conclusion resulting from the jury tampering hearing are without merit.
 
 
 90
 The judgments are AFFIRMED and the cases are returned to the district court for a determination of attorney's fees allowable to appellees for services performed subsequent to those for which the trial court has already entered judgment.
 
 
 
 [1]
 One of each of the letters of Carter, James and Black is reproduced here:
 October 25, 1979
 Mr. Frank Andresik
 American Freight Systems
 9393 West 110th St.
 Overland Park, Kansas--66210
 Dear Mr. Andresik:
 We have long enjoyed a cordial business relationship with your company and regret that this letter has to be written, but in view of some recent happenings, we feel that we can no longer give you the unrestricted support we have in the past.
 The formation of McKinney Forwarding Company has put your local agent in direct competition with our company as well as all freight forwarders and brokers in the Savannah area. In our opinion, any shipper moving freight over your line for export immediately becomes a target for solicitation by our newly formed competition, employed by you, with ready access to information which has historically been of a confidential shipper, trucker, forwarder nature.
 Although we dislike taking this action, we are, effective immediately, discouraging the routing of any freight via American Freight Systems. We believe this action is prudent under the circumstances.
 Yours very truly,
 D.J. Powers Co., Inc.
 s/ William E. Carter
 President.
 * * *
 October 26, 1979
 Mr. James F. Eaton
 Carolina Freight Carriers
 P.O. Box 697
 Cherryville, North Carolina 28201
 Dear Mr. Eaton:
 It has come to my attention as of late that your agent in Savannah, Port Terminal Warehouse Company, Inc., through Mr. Allen McKinney, owner of same has somehow qualified as a licensed Foreign Freight Forwarder. The name of this new firm is McKinney Forwarding Company.
 This letter is to inform you that the writer is not in position, nor inclined, to render freight of any type to it's [sic] competitors. It is obvious that the proprietary information contained in truckers bill of lading shall not fall into competitive hands. As a licensed foreign freight forwarder and customs broker I am prohibited from revealing to anyone sensitive information of this nature which may possibly fall into unauthorized hands. Under these circumstances (Mr. McKinney involving himself in a Foreign Freight Forwarding operation) I can no longer utilize the services of your trucking company. It shall also be my pleasure to recommend to my cleints [sic] presently utilizing your services to discontinue same.
 Sincerely,
 s/ Thomas C. James
 President
 JOHN S. JAMES COMPANY
 * * *
 October 29, 1979
 Mr. James R. Eaton, Vice-President Sales
 Carolina Freight Systems
 P.O. Box 697
 Cherryville, N.E. 28201
 RE: McKinney Forwarding Co.
 Dear Mr. Eaton:
 It has come to our attention that your agent in Savannah, Georgia has established itself as a licensed foreign freight forwarder. It is needless to say that we can no longer consider utilizing the services of your firm due to the conflict of interest which you have allowed to develop.
 By copy of this letter, I am instructing all offices of our firm to cease utilizing your services immediately.
 Sincerely,
 s/ James P. Black
 President
 cc: R.A. Richards--Charleston
 W.O. Moore--Charleston
 J. McDaniel--Charleston
 G. Bransford--Atlanta
 R. Kelly--Savannah
 K. Bennett--Savannah
 
 
 [2]
 This quoted language comes from defendant's oral motion for directed verdict